**Li–Wen ROONEY, Plaintiff,**

v.

**CAPITAL DISTRICT TRANSPORTATION AUTHORITY, Defendant.**

**No. 98-CV-2000.**

United States District Court, N.D. New York.

Aug. 11, 2000.

As Amended Sept. 7, 2000.

---

Featherstonhaugh, Conway, Wiley & Clyne, LLP, Albany, New York, NY, Nadine Feiden Shadlock, of counsel, for plaintiff.

Susan E. Beaudoin, Albany, New York, for defendant.

## MEMORANDUM—DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Li–Wen Rooney ("plaintiff") commenced this employment discrimination action against Capital District Transportation Authority ("defendant" or "CDTA") by a complaint dated December 29, 1998, followed by an amended com-

plaint dated March 1, 1999.[1] Plaintiff alleges sexual harassment under the theories of hostile work environment and retaliatory discharge pursuant to 42 U.S.C. § 2000e ("Title VII"), and the New York Executive or "Human Rights" Law § 296 ("HRL"). Plaintiff requests damages of no less than One Million Dollars, including punitive damages.

Defendant has moved for summary judgment dismissing plaintiff's complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has opposed defendant's motion and cross-moved for partial summary judgment on the issue of defendant's purported entitlement to Eleventh Amendment immunity. Oral argument was heard on April 28, 2000 in Albany, New York. Decision was reserved.

## II. *FACTS*

CDTA is a public authority, created as an act of the New York State Legislature. It operates as a public benefit corporation. In January 1998, a payroll clerk position was vacated and CDTA needed temporary staffing while it conducted interviews to fill the position permanently. Adecco sent plaintiff to fill the temporary position in mid-February. Initially the placement was expected to last for a few months, but it was extended on a month-to-month basis, and then every two weeks. (*See* Williams Dep. at 70–71.)

In May 1998, CDTA filled the vacant payroll clerk position. According to CDTA's comptroller Louis A. Williams III, plaintiff's employment was continued initially for purposes of training the new employee, Frank Niedzwiedski ("Frank N."). Plaintiff's employment was thereafter extended in part so that she would be available to fill in for others on summer vacation. *See id.* at 24, 38. In addition, because plaintiff had demonstrated skills in operating the computer, it was anticipated that she would continue at CDTA to assist in the conversion of data from the older financial information software system to a new Y2K-compliant system that CDTA was intending to purchase. *See id.* at 32–33. Plaintiff believed that the Y2K project would enable her to continue working at CDTA until the year 2000. (*See* Pl.Dep. at 67.)

When Frank N. began working at CDTA, he took over plaintiff's workstation and she was moved to a desk adjacent to his. There was only one computer terminal in their work area. The space for exiting the work area they shared was just a few feet wide. According to plaintiff's deposition testimony, on July 24, 1998, plaintiff was standing in front of the computer and Frank N. approached her, placed his arm around her such that he touched her breast, stroked her hair, and kissed the back of her neck. Frank N. then knelt down, placing his hand between plaintiff's legs and kissed her thigh. *See id.* at 79–81. Plaintiff testified that she said, "What are you doing?" and then stated that there were video surveillance cameras everywhere, prompting Frank N. to back off and look for the cameras.[2] *See id.* at 81.

Plaintiff states that after the incident she was scared, and did not know what to do. She attempted to tell a supervisor, Kathy Romand, that afternoon, but claims that Frank N. followed her into Romand's office so that plaintiff was unable to inform her. *See id.* at 82–83. After work, plaintiff completed the purchase of a sewing machine from Frank N. Plaintiff and her husband had purchased the sewing machine after viewing it at Frank N.'s home the previous evening. According to the arrangement made at that time, Frank N.

1. Originally, Adecco Employment Services, Inc. ("Adecco") was also named as a defendant. By stipulation dated February 7, 2000, however, the action against Adecco was discontinued and Adecco was deleted from the caption.

2. In the written "Statement of Sexual Harassment" that plaintiff prepared in July 1998, she recalled having stated, prior to the video alert, "Stop, what are you doing? You shouldn't do this." (Shadlock Aff.Ex. A.)

was to drop off the machine at plaintiff's home after work on Friday, July 24, 1998. This entailed following her home in his car after work, and dropping off the machine at her front door in the presence of her husband. *See id.* at 85–87.

Although she was initially fearful that Frank N. would retaliate, plaintiff reported the incident to her direct supervisor, Donna Gillis, by telephoning her at home on July 29, 1998. *See id.* at 92–93. Gillis then contacted Michael Collins, CDTA's Director of Personnel and Safety, to advise him of the situation. The next day, July 30, 1998, Gillis accompanied plaintiff to the office of Betsy Voss, CDTA's Director of Training.[3] Plaintiff made an oral complaint of sexual harassment at that time. Voss informed CDTA's Executive Director Dennis J. Fitzgerald that same day, and Fitzgerald directed Voss to conduct an investigation. (*See* Fitzgerald Dep. at 52–53.) On July 31, 1998, plaintiff submitted a written "Statement of Sexual Harassment" to Voss, which was forwarded to Fitzgerald.[4] (*See* Shadlock Aff.Ex. A.)

Voss conducted an investigation which included interviewing Frank N. He admitted only to puffing his arm around plaintiff and touching her hair. At his deposition, Frank N. confessed to having told plaintiff she was beautiful, that he liked dark skin, as well as having run his fingers through her hair, and kissing either her hair or neck. (*See* Frank N. Dep. at 71–72, 77–79, 94–95.) Voss also interviewed Gillis, Romand, other co-workers, and the superintendent where Frank N. was previously employed. She reviewed Frank N.'s personnel file and found no record of previous incidents of sexual harassment. Voss claims that plaintiff reported no continuing incidents of sexual harassment. (*See* Voss Dep. at 91.)

Although plaintiff has not alleged further sexual acts, plaintiff claims in her interrogatory responses that Frank N. continued harassing and intimidating her in the following ways: (1) on July 24, 1998, grabbing plaintiff's hand from behind as he walked by; (2) on July 27, 1998, questioning plaintiff as to her husband's financial interest in their home; (3) on July 28, 1998, winking at plaintiff in an "inviting" manner; (4) on July 30, 1998, greeting plaintiff with the pet name "Mona Lisa"; (5) on July 30, 1998, questioning plaintiff where she had been at lunch (plaintiff had used her lunch hour to meet with Gillis and Voss about her sexual harassment complaint); (6) on July 30, 1998, commenting in the presence of a co-worker that a telephone call to plaintiff was from her boyfriend, and that plaintiff should consider having a boyfriend in addition to her husband; (7) on August 11 and 12, 1998, "singing happily in a taunting undertone type of way" whenever he was near plaintiff; and (8) on August 14, 1998, by walking closely in front of plaintiff so as to control her forward progress on two occasions when she left her seat at their shared workstation to go to another part of the office. (*See* Shadlock Aff.Ex. G; *see also* Pl.Dep. at 90–91, 103; Def. Response to Discovery, Item 65.) Both Gillis and Voss acknowledge that plaintiff alerted them of Frank N.'s continued humming in a manner that she felt was taunting. (Gillis Dep. at 124; Voss Dep. at 114–15 (mentioning humming and winking.))

Plaintiff claims she first requested (to both Gillis and Voss) to have her assigned work space moved from the area shared with Frank N. on July 31, 1998. (*See* Shadlock Aff.Ex. E; Pl.Dep. at 100.) She claims to have reiterated this request on August 14, and when it was denied, she stopped

---

3. Voss is one of two individuals designated in CDTA's sexual harassment policy to receive and investigate complaints. Although plaintiff claims she had not yet been given a copy of CDTA's sexual harassment policy, it was posted in the lunchroom and possibly other areas. (*See* Voss Dep. at 19–20.)

4. Although Voss provided a company form to plaintiff for filing a sexual harassment complaint, plaintiff opted to draft a memorandum.

going to work because she felt she could no longer endure the circumstances. (*See* Shadlock Aff.Ex. E; Pl.Dep. at 112.) Plaintiff allegedly made the same request on August 17, and August 21. (*See* Shadlock Aff.Ex. E.) Plaintiff also testified that she informed Gillis that she would not return to work until the investigation was complete. (*See* Pl.Dep. at 117.)

On August 21, 1998, plaintiff's spouse hand-delivered to Voss a formal "Charge of Sexual Harassment" which plaintiff had completed (Voss had earlier provided plaintiff with this form). *See id.* at 99, 120. This document states that in addition to the incident of July 24, Frank N. continued intimidating plaintiff, for example by getting up from his seat and impeding plaintiff's forward progress when she got up from her desk on two occasions on August 14. On August 22, 1998, plaintiff received a letter from Fitzgerald dated August 21, 1998, stating that the investigation was complete and plaintiff could schedule a meeting to have the results explained to her. (*See* Shadlock Aff.Ex. H.) Plaintiff telephoned CDTA on August 24, and a meeting was scheduled for August 31. (*See* Pl.Dep. at 122–123.)

On August 31, 1998, plaintiff and her husband met with Fitzgerald and CDTA Attorney Beaudoin. Fitzgerald informed plaintiff that the investigation was complete and action had been taken against Frank N. Plaintiff was not notified as to the specific nature of the action taken. Plaintiff inquired about returning to work, but was purportedly told by Fitzgerald that he did not know the termination date of her contract. Plaintiff was informed that she should call the next day. *See id.* at 124–25. Plaintiff was asked if Frank N. had continued to harass her after the incident and plaintiff stated that Frank N. had continued to make her feel uncomfortable, for example by singing. *See id.* at 125.

The next day, September 1, 1998, plaintiff called Gillis to find out the status of her contract, but Gillis did not know and advised that Williams would make the de-

cision. Plaintiff informed Gillis that she wished to return to work but that she wanted to be separated from Frank N. *See id.* at 126–27. Later that day, plaintiff received a call from Williams, who informed her that her contract was to end on September 4, and that her services were no longer needed. Plaintiff requested the opportunity to work the final three days but was told that the contract was effectively null since she had not shown up for work on or after August 17. *See id.* at 65, 128.

On September 2, 1998, plaintiff went to the office and delivered a letter requesting that she be physically separated from Frank N. (the letter notes that she had previously made this request on August 17, August 24, and September 1, 1998). (*See* Shadlock Aff.Ex. F.) Plaintiff says she was told she could not return to work. (Pl.Dep. at 147.) Voss and Williams both testified that they received no prior requests from plaintiff to be separated from Frank N. (*See* Voss Dep. at 49; Williams Dep. at 60–61.) Williams claims he told plaintiff over the telephone that it would be impossible to separate her from Frank N., as all the desks in the department were within eight feet of each other and in the same room. (*See* Williams Dep. at 66.) Williams also stated during his deposition that his decision to terminate plaintiff's services was made prior to his learning the results of the sexual harassment investigation. *See id.* at 58.

Following its investigation in August, CDTA imposed certain remedial actions on Frank N., including a two-day suspension without pay, sexual harassment seminar, and a written warning. Frank N.'s suspension was implemented in mid-September 1998. *See id.* at 52–53. Plaintiff maintains she was never informed of this punishment and only learned of it after discovery in this lawsuit.

Plaintiff began working at Fleet Bank on September 3, 1998, having been placed through Accountemps. She had looked for other employment prior to the incident of

July 24, 1998. (*See* Pl.Dep. at 39–40, 160.) In January 1999, plaintiff secured a regular full-time position with the New York State Comptroller's office as an accountant.

## III. *DISCUSSION*

### A. *Jurisdiction*

Jurisdiction over this matter is based upon federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 2000e–2 *et seq.* This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 regarding plaintiff's claims under New York Executive Law §§ 296 *et seq.*

### B. *Summary Judgment Standard*

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.1999). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Courts have urged care in reviewing discrimination claims, noting that "[b]ecause direct evidence of ... discriminatory intent will rarely be found, 'affidavits and depositions must carefully be scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir. 1994)). Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348; *see also Schwapp,* 118 F.3d at 110 ("even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."). To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *See Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. Conversely, "summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion." *Richardson,* 180 F.3d at 438.

### C. *Hostile Work Environment*

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Accordingly, "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v.*

*Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).[5]

In order to establish a *prima facie* case of hostile work environment discrimination, a plaintiff must sufficiently plead and prove: (1) that she is a member of a protected group; (2) that she was the subject of unwelcome advances; (3) that the harassment was based upon her sex; and (4) that the harassment affected a term, condition or privilege of her employment. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1042 (2d Cir.1993). The fourth element is established by showing that her workplace "was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment." Further, a plaintiff must also demonstrate that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp,* 118 F.3d at 110 (citation omitted).

The parties do not dispute that plaintiff is a member of a protected group for purposes of Title VII. Regarding the second element, defendant argues that Frank N.'s conduct did not constitute sexual harassment because it was not "unwelcome." Defendant suggests, based on *Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir.1982), that "unwelcome" means that the victim did not "solicit or incite" the challenged conduct and that the victim "regarded the conduct as undesirable or offensive." Defendant then contends that Frank N.'s conduct was not unwelcome because plaintiff did not so inform Frank N. at the time of his sexual overture, remained at work for the rest of the day, and later allowed him to follow her home in his car to drop off the sewing machine.

Defendant's argument has no merit. First, there is no evidence that plaintiff either solicited or incited Frank N.'s behavior on July 24, 1998, or at any other time. Second, the facts do not suggest that plaintiff regarded Frank N.'s conduct as anything but undesirable. Following and/or during the incident, plaintiff immediately questioned Frank N.'s physical contact and invented an excuse—the video surveillance cameras—in an effort to terminate these acts. Further, plaintiff testified that she attempted to inform Romand that afternoon but was impeded and intimidated by Frank N. following her into Romand's office. The fact that plaintiff finished work that day and, with her husband, accepted a sewing machine which they had previously purchased, hardly signals that she did not view the sexual touching by Frank N.'s in their office as undesirable. Moreover, plaintiff has averred that she subsequently requested physical separation from Frank N., repeatedly, and did not return to work when defendant declined to accommodate this request.

Neither is the defendant's second argument, that the challenged conduct fails to constitute sexual harassment because the conduct was not sexual or "because of" plaintiff's sex persuasive. Defendant purports to make this argument on the basis of "[t]he conduct to which [Frank N.] has admitted"—namely, that he simply touched plaintiff's hair and put his arm around her. (Def.Mem. at 16.) As defendant should be well aware, however, plaintiff has alleged more than that, and Frank N. has admitted to more than that, under oath.[6] Drawing all inferences in favor of plaintiff, as the Court is obligated to do on defendant's motion, requires a finding that Frank N.'s conduct was of a sexual nature. Indeed, the theory that Frank N.'s act of

---

**5.** Because New York courts require the same standard of proof on claims brought under the HRL as those brought under Title VII, the foregoing analysis applies to plaintiff's Title VII and state claims in tandem. *See Badlam v. Reynolds Metals Co.,* 46 F.Supp.2d 187, 193 n. 3 (N.D.N.Y.1999).

**6.** Even CDTA's Executive Director and General Manager, Dennis J. Fitzgerald, characterized Frank N.'s admitted conduct as a "sexual advance" which was "unwelcomed as far as [plaintiff was] concerned." (Fitzgerald Dep. at 75.)

kissing plaintiff and touching her hair, breast, and legs in the office they shared "does not rise to a sexual level," (*see* Def. Mem. at 16), borders on frivolous. Insofar as defendant disputes plaintiff's version of the incident on July 24, 1998, this creates a triable issue of material fact beyond the scope of the present consideration.

The next focus will be on whether the alleged sexual harassment affected a term, condition or privilege of plaintiff's employment by creating a hostile work environment. Conduct "sufficiently severe or pervasive" to create a hostile environment is that which "a reasonable person would find hostile or abusive" and which the victim subjectively perceived to be abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). For reasons already discussed, there can be no question as to plaintiff's subjective perception that defendant's work environment was abusive.

■■■ A work environment is "objectively hostile" where a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse. *See Richardson*, 180 F.3d at 436. "Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000). The existing circumstances should be considered "cumulatively." *Schwapp*, 118 F.3d at 111 (citation omitted). Factors relevant to determining whether plaintiff's working conditions meet the standard may include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonable interfered with plaintiff's work; and (5) what psychological harm, if any, resulted. *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

■■■ Generally, an isolated episode of harassment will not suffice to demonstrate a hostile work environment unless it was "extraordinarily severe." *Cruz*, 202 F.3d at 570. Otherwise, a plaintiff may show that a "series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* However, "[t]here is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Richardson*, 180 F.3d at 439 (quotation omitted); *see also Harris*, 510 U.S. at 22, 114 S.Ct. 367 (hostile environment is not a "mathematically precise test"). Thus, for example, in *Ellen Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir.2000), the Second Circuit reversed the District Court's grant of summary judgment for the defendant in a hostile work environment claim. The lower court's dismissal was apparently based solely on the fact that the plaintiff had alleged "a single incident of verbal harassment." In reversing, the Second Circuit explained that the lower court had failed to consider the totality of the circumstances, including the fact that the verbal offense was a long obscene tirade witnessed by plaintiff's coworkers.

■■■ In the present case it can not be said, as a matter of law, that the alleged incidents do not constitute a hostile work environment. The primary incident of July 24, 1998, was physical, not a mere offensive utterance. The incident was severe enough to cause plaintiff psychological distress, as evidenced by the fact that plaintiff repeatedly requested separation from Frank N. at work, and was unable to return to work after August 14, 1998, until she could learn the results of defendant's investigation. In addition, the subsequent humming, comments, and physical intimidation of a less sexual nature attributed to Frank N. must be regarded in light of the initial incident (cumulatively), not independently. While a trier of fact may conclude

that plaintiff's environment was indeed not so objectionable as to alter the terms and conditions of her employment, the record does not compel that as the only result. In other words, a reasonable person could find her working conditions altered for the worse if she was kissed and fondled by a co-worker with whom she shared a workstation and then after reporting the incident, forced to continue working in close proximity with the harasser, thereby enduring further taunting and physical intimidation.

### D. *Employer Liability*

■ As mentioned above, plaintiff must also establish a basis for imputing Frank N.'s harassing conduct to CDTA. Where the harasser is the victim's co-worker, employer liability is governed by a negligence standard. *See Richardson,* 180 F.3d at 441; *Faragher v. City of Boca Raton,* 524 U.S. 775, 779, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting agreement among the circuits). Accordingly, courts in the Second Circuit have provided that "[w]hen a 'co-employee'—as distinct from a supervisor— is alleged to have engaged in harassing activity, the 'employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.' " *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998) (*quoting Tomka v. Seiler,* 66 F.3d 1295, 1305 (2d Cir.1995)); *accord Richardson,* 180 F.3d at 441; *see also* 29 C.F.R. § 1604.11(d) (employer responsible for acts of sexual harassment between co-workers where employer "knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."). In the instant matter, the parties do not dispute that CDTA had knowledge of Frank N.'s harassing conduct toward plaintiff on July 24, 1998.

■ "An employer that has knowledge of a hostile work environment has a duty to take reasonable steps to remedy it." *Distasio v. Perkin Elmer Corp.,* 157 F.3d

55, 65 (2d Cir.1998). Courts analyze whether the employer's response was reasonable in light of the totality of the circumstances, including factors such as "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Id.* at 65. Significantly, the mere existence of a complaint procedure and an investigation of a complaint pursuant to the procedure do not *per se* insulate an employer from imputation of an employee's misconduct. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1180–81 (2d Cir.1996); *accord Rivera v. Prudential Ins. Co. of Am.,* Nos. 95–CV–0829, 95–CV–0830, 1996 WL 637555, at *10 (N.D.N.Y. Oct.21, 1996).

■ The assessment of the employer's response to the inappropriate conduct is frequently considered a jury question. *See Reed,* 95 F.3d at 1181. Indeed, "[i]f the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Gallagher v. Delaney,* 139 F.3d 338, 348 (2d Cir.1998); *accord Richardson,* 180 F.3d at 441.

In response to plaintiff's initial complaint of sexual harassment, defendant conducted an investigation, and ultimately suspended Frank N. for two days without pay, had him attend a sexual harassment seminar, and issued a written warning. The suspension, however, was not effected until September, after plaintiff's employment was terminated. The evidence presented also indicates that Gillis and/or Voss were aware that Frank N.'s conduct during the period from July 24 through August 14, 1998, continued to make plaintiff feel threatened. Gillis also knew that plaintiff had declined to return to work after August 14, until the investigation was complete and resolved. In addition, plaintiff has testified that she repeatedly requested physical separation from Frank N., but no attempt was made to separate them. In light of the fact that plaintiff shared a workstation with her alleged har-

asser such that further interaction at some level was unavoidable, and that plaintiff has alleged further intimidating conduct enabled by their proximity, a jury could disagree on whether defendant's response was timely, appropriate and adequate.

### E. *Retaliation*

Title VII prohibits the firing of employees in retaliation for their opposition to discriminatory practices or participation in an investigation under Title VII. *See* 42 U.S.C. § 2000e–3(a). New York's Executive Law contains an analogous prohibition corresponding to the New York Human Rights Law. *See* N.Y.Exec.Law § 296(1)(e). Title VII is violated "when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause. In addition, Title VII is violated when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist." *Cosgrove,* 9 F.3d at 1039.

Retaliation claims are analyzed under the three-part burden shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[7] *See Reed,* 95 F.3d at 1178; *Richardson,* 180 F.3d at 443. A plaintiff, accordingly, must first establish a *prima facie* case of retaliation. Second, the defendant has the burden of articulating a legitimate, non-retaliatory reason for the complained of conduct. Finally, if the defendant meets its burden, the plaintiff must adduce evidence sufficient to demonstrate that the proffered legitimate reason was merely a pretext for the impermissible retaliation. *See Quinn,* 159 F.3d at 768–69; *Gallagher,* 139 F.3d at 349.

In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the

plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Quinn,* 159 F.3d at 769; *Gallagher,* 139 F.3d at 349. To constitute "protected activity" for purposes of meeting the first element, the employee need only establish that she opposed an employment practice based on a "good faith, reasonable belief" that such employment practice was unlawful. *See id.*

In the present case defendant makes no argument regarding plaintiff's initial burden other than a conclusory statement that summary judgment should be granted "as plaintiff cannot establish a *prima facie* case of retaliation." (Def.Mem. at 20.) It is clear, however, that plaintiff has met this burden. First, plaintiff participated in a protected activity when she informed her supervisor and submitted a written statement claiming she had been sexually harassed by her co-worker and later participated in a meeting called by defendant to discuss the results of its investigation. Whether or not plaintiff ultimately succeeds on her hostile work environment claim in this lawsuit, plaintiff has provided sufficient evidence for a jury to find that she believed in good faith that CDTA violated the law.

Second, plaintiff suffered an adverse employment action when she was terminated from her position at CDTA. Third, plaintiff sufficiently established a "causal connection" because the protected activity was followed closely in time by the adverse action. *See Reed,* 95 F.3d at 1178 (causal connection may be established by temporal proximity of complaint and adverse employment decision); *Quinn,* 159 F.3d at 769 (causal connection requirement satisfied where discharge came less than two months after filing complaint). Plaintiff was fired one month after she complained to her superiors about Frank N.'s conduct, and one day after participating in a meet-

---

**7.** Because the legal standard is the same under both federal and state law in the context of retaliatory discharge, the Court will again treat plaintiff's claims in unison. *See Reed,* 95 F.3d at 1177.

ing whereby CDTA informed her that the investigation was complete and some unspecified action had been taken. Accordingly, plaintiff has established a *prima facie* case of retaliation.

▮ Defendant, however, has met its burden of producing legitimate, nondiscriminatory reasons for terminating plaintiff's employment. Defendant points out that plaintiff was hired initially to provide temporary staffing during the interview process for a permanent position. Defendant then explains that plaintiff was kept on to train the new person, and then through the summer to fill in for others on vacation. Defendant admits that plaintiff was also retained to provide data conversion services for an anticipated Y2K project, but that the Y2K project was "not realized in a timely manner." Defendant argues, therefore, that because when summer ended the relevant personnel had returned from vacation and the Y2K conversion was no longer imminent, plaintiff's services were no longer needed at all.

Relying primarily on *Holava–Brown*, 189 F.3d 461 (Table), 1999 WL 642966 (2d Cir. Aug.20, 1999), defendant further argues that the above facts preclude a finding of pretext as a matter of law.[8] In *Holava–Brown*, a temporary employee was leased for a six-month period and her assignment was terminated almost exactly on the date projected by the employer. During this period the employee filed a sexual harassment complaint. Although the facts demonstrated that some other temporary employees had their contracts extended, that plaintiff's supervisor had indicated her position would last one year, and that plaintiff believed substantial work remained which she could have continued doing, the Court of Appeals upheld the lower court's grant of summary judgment for the defendant on the plaintiff's retalia-

tion claim. The Court reasoned that the above facts were not sufficient to raise an inference of pretext given that the projected employment duration was fulfilled. *See Holava–Brown*, 1999 WL 642966, at *5–6. Defendant further contends that like situation considered in *Holava–Brown*, here plaintiff was not replaced with any temporary or permanent employee after her termination from CDTA, a fact which the Second Circuit afforded significance. *See Holava–Brown*, 1999 WL 642966, at *5.

In contrast to the circumstances in *Holava–Brown*, however, here plaintiff's position had been extended during her period of employment to a purpose different from that which she was initially hired. While the *Holava–Brown* court did not find plaintiff's belief that more work remained sufficiently specific to raise an issue of fact, here there is no dispute that both plaintiff and defendant anticipated that plaintiff would assist in the impending Y2K data conversion based on her particular skills. While defendant mentions a delay in implementing this project, defendant fails to specify when it became known that the delay would be large enough to preclude assistance from plaintiff. It is also unclear, given that Williams claims to have made the decision to end plaintiff's contract back in August, why neither Fitzgerald nor Gillis made this fact known to plaintiff when she inquired as to the status of her contract between August 31 and September 2. Finally, defendant's assertion that plaintiff was not replaced is ambiguous as to whether CDTA simply did not hire another temporary accountant (plaintiff's initial position) or that it never hired anyone to assist in its data-conversion project (a project later assigned).

Finally, even if defendant had no obligation to renew plaintiff's contract, defendant offers no explanation as to why plaintiff was terminated so abruptly after the

---

**8.** While this case is distinguishable for the reasons discussed herein, it cannot go without mention that *Holava–Brown* is an unpublished opinion which, pursuant to section 0.23 of the Rules of the United States Court of Appeals for the Second Circuit, is without precedential authority. Accordingly, insofar as defendant's argument is dependent upon the *Holava–Brown* ruling, it should be disregarded in any event.

meeting regarding CDTA's investigation, three days before her existing contract was to expire. *See Quinn*, 159 F.3d at 770 (strong temporal correlation between complaints and discharge contributed to inference of pretext). Accordingly, construing the record in the manner most favorable to plaintiff, "[t]he intent of the employer is a factually disputed matter precluding summary judgment." *Gallagher*, 139 F.3d at 350.

### F. Punitive Damages

■■■ The waiver of sovereign immunity effected by section 8 of the Court of Claims Act prohibits punitive damages from being assessed against the State or its political subdivisions. *See Sharapata v. Town of Islip*, 56 N.Y.2d 332, 334, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982). This immunity has been extended to public benefit corporations. *See Clark–Fitzpatrick, Inc. v. Long Island Ry. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). There is no dispute that defendant is a public authority operating as a public benefit corporation. *See* New York State Public Authorities Law §§ 1301 *et seq.* Under New York law, therefore, plaintiff's claim for punitive damages against CDTA cannot be sustained. As a general rule punitive damages may be awarded under Title VII, but all of the cases cited by plaintiff involve lawsuits against private entities and consequently fail to address defendant's argument. *See* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) . . . "). Plaintiff's claim for punitive damages must be dismissed.

### G. Eleventh Amendment Immunity

■■■ Finally, defendant argues it cannot be charged with a violation of Title VII pursuant to the recent Supreme Court decision in *Kimel v. Florida Bd. Of Regents*, — U.S. ——, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). In *Kimel*, the Supreme Court held that the Age Discrimination in Employment Act (the "ADEA") did not validly abrogate States' Eleventh Amendment immunity from suit by private individuals, a group of employees was thereby prohibited from suing their state employer in federal court for violation of the ADEA. The Supreme Court stated that while the ADEA contains a clear statement of Congress' intent to abrogate the States' immunity, that abrogation exceeded Congress' authority under § 5 of the Fourteenth Amendment. *See Kimel*, 120 S.Ct. at 650. Defendant reasons that as a state agency, based on *Kimel*, it cannot be sued in federal court for any violation of Title VII.

In *Kimel*, however, the Supreme Court recognized in dicta that age classifications are "unlike government conduct based on race or gender," because age classifications are not suspect under the Equal Protection Clause. *See id.* at 645. Moreover, federal courts, including the Second Circuit, have expressly declined to apply the result in *Kimel* to suits brought under Title VII. *See, e.g., Butler v. New York State Dep't of Law*, 211 F.3d 739, 746 (2d Cir.2000) (noting that *Kimel* does not address a state employee's ability to sue under Title VII); *Holman v. Indiana*, 211 F.3d 399, 402 n. 2 ("The Eleventh Amendment does not bar the [plaintiffs'] Title VII claims.").[9]

The plaintiff's motion for partial summary judgment must be granted on the issue of defendant's lack of entitlement to Eleventh Amendment immunity.

### IV. CONCLUSION

For the foregoing reasons, there is a sufficient basis for a trier of fact to con-

---

**9.** There is no briefing on the issue of whether CDTA as a public authority is immune from suit under the HRL. Plaintiff argues that CDTA is not an arm of the state, and therefore, not entitled to any Eleventh Amendment immunity whatsoever. Defendant offers no response. *See, e.g., Gragg v. New York State Dep't of Envtl. Conservation*, No. Civ.A. 97CV1506RSPGJD, 2000 WL 246272, at *3 (N.D.N.Y. March 3, 2000) (New York State has not waived its sovereign immunity to allow suits under the HRL in federal court).

clude that plaintiff was subjected to a hostile work environment on July 24, 1998, and thereafter until her employment was terminated, and that the reasons defendant offered for plaintiff's dismissal were at least partially pretextual. Defendant is not entitled to Eleventh Amendment immunity with respect to plaintiff's claims under Title VII. Nevertheless, plaintiff's demand for punitive damages must be dismissed.

Accordingly, it is

ORDERED that

1. Defendant Capital District Transportation Authority's motion for summary judgment is DENIED except as to plaintiff's demand for punitive damages; and

2. Plaintiff Li–Wen Rooney's cross motion for partial summary judgment is GRANTED.

IT IS SO ORDERED.