Collette J. SCOTT, Plaintiff,

v.

**CITY OF NEW YORK DEPARTMENT OF CORRECTION, Correction Officers' Benevolent Association of the City of New York, Inc, and Norman Seabrook, Defendants.**

No. 04 Civ. 9638(SHS).

United States District Court, S.D. New York.

June 17, 2009.

Donnahue G. George, Law Offices of Donnahue George, Brooklyn, NY, Susan B. Egan, Egan Law Firm, New York, NY, for Plaintiff.

Alan Serrins, Queller, Fisher, Washor, Fuchs & Kool LLP, Carolyn Walker–Diallo, Ivan A. Mendez, Jr., Michael Keith Blauschild, NYC Law Department, Office of the Corporation Counsel, Joanna Ruth Helferich, New York City Law Department, Danielle Marie Dandrige, Hoey, King, Toker & Epstein, New York, NY, for Defendants.

## ORDER

SIDNEY H. STEIN, District Judge.

Plaintiff Collette J. Scott brings this action against defendants Norman Seabrook and the Corrections Officers' Benevolent Association of the City of New York ("COBA") (collectively, "Seabrook defendants") and against the City of New York Department of Corrections ("DOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") as well as various provisions of New York state law. Scott's complaint, which centers on allegations of a sexual assault by defendant Seabrook, raises two remaining claims: (1) as a result of the assault, defendants subjected Scott to a hostile work environment, one for which both COBA and the DOC should be held legally responsible; and (2) thereafter, defendants retaliated against Scott for exercising her rights pursuant to Title VII as well as state law.

Defendants have moved for summary judgment on all of Scott's claims, and on June 15, 2009, Magistrate Judge Gabriel W. Gorenstein issued a Report detailing the procedural history of the case and recommending that summary judgment be granted for all defendants with respect to plaintiff's retaliation claims and that summary judgment be granted for the DOC only with respect to plaintiff's hostile work environment claims. As for Scott's hostile work environment claim against the Seabrook defendants, Magistrate Judge Gorenstein determined that the Seabrook defendants were not entitled to judgment as a matter of law and accordingly recommended that summary judgment be denied with respect to that claim. Scott and the Seabrook defendants filed timely objections to aspects of that Report and Recommendation,[1] and defendant DOC filed timely responses to plaintiff's objections.

---

1. By letter dated July 2, 2009 the Seabrook defendants asserted that plaintiff's objections

After de novo review of the Report and Recommendation, Scott and the Seabrook defendants' objections, and the DOC's response to plaintiff's objections, *see* 28 U.S.C. § 636(b)(1)(B and C), the Court adopts Magistrate Judge Gorenstein's Recommendation in its entirety. In particular, the Court does not find—as Seabrook defendants urge—that no reasonable juror could conclude plaintiff's allegations against Seabrook defendants, if proven at trial, establish that the union and its leadership "otherwise discriminate[d]" against Scott on the basis of her sex through a course of conduct that includes one very severe, alleged event. *See* 42 U.S.C. § 2000e–2(c)(1). Therefore, Seabrook defendants are not entitled to judgment as a matter of law on plaintiff's hostile workplace claim.

With respect to plaintiff's objections, while the Court acknowledges its duty to construe liberally what was at the time a pro se complaint, no plaintiff can rely solely on allegations as set forth in a complaint at this stage. Rather, faced with defendants' summary judgment motion, Scott was required to offer "concrete facts from which a reasonable juror could return a verdict in its favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Id.* ("Rule 56(e) itself provides that ·a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.") As set forth in Magistrate Judge Gorenstein's very thorough and well reasoned Report, Scott has not met her burden in this regard.

Accordingly, IT IS HEREBY ORDERED that DOC's motion for summary judgment is granted in its entirety, and Seabrook defendants' motion for the same is granted with respect to Scott's retaliation claims but otherwise denied.

SO ORDERED.

## REPORT AND RECOMMENDATION

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

Plaintiff Collette Scott ("Scott") brings this action against defendants Norman Seabrook ("Seabrook") and the Correction Officers' Benevolent Association of the City of New York, Inc. ("COBA") (collectively "the Seabrook defendants"), and the City of New York Department of Correction ("DOC") alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 296, and the New York City Administrative Code, N.Y. City Admin. Code § 8–107. Scott alleges that she was sexually harassed by the Seabrook defendants; that she was

to the Report and Recommendation were untimely and requested the Court disregard them as a result. That request can be readily rejected because it is premised on a miscalculation of the time given plaintiff by the Federal Rules to respond to the Report. Fed. R.Civ.P. 72(b) provides that a party must object "within 10 days after being served with a copy of the recommended disposition." However, Rule 6, which governs the computation of time under the Federal Rules, directs the Court is to "[e]xclude the day of the act, event, or default that begins the period," and,

"when the period is less than 11 days," to "[e]xclude intermediate Saturdays, Sundays, and legal holidays." Fed.R.Civ.P. 6(a)(1)-(2). Here, Scott was served the Report on June 16, 2009. Her ten-day window in which to respond, thus, began June 17, 2009, and, excluding "intermediate Saturdays, Sundays, and legal holidays," ran through the end of the day on June 30, 2009, the very date on which Scott filed her objections. Accordingly, plaintiff's objections were timely and will be considered by the Court.

sexually harassed in her workplace; and that both the Seabrook defendants and the DOC retaliated against her for exercising her rights under Title VII.

## I. BACKGROUND

### A. Procedural History

#### 1. Charges Filed

On February 14, 1997, Scott filed a complaint with the New York City Commission on Human Rights. *See* Verified Complaint, No. M–E–0S–97–1003744–E (annexed as Ex. B to Declaration of Michael K. Blauschild ("Blauschild Decl.") (annexed to Notice of Motion, filed Sept. 22, 2006 (Docket # 46) ("DOC Mot."))) ("NYCCHR Compl."). The Commission found "No Probable Cause" to believe that Scott had been sexually harassed. *See* Letter from Luis R. Burgos, Jr., Deputy Commissioner for Equal Employment Opportunity, to Office of the Managing Attorney (Aug. 5, 1997) (annexed as Ex. 1 to Defendants' Memorandum of Law in Support of Summary Judgment, filed Sept. 15, 2006 (Docket # 43) ("Seabrook Mem.")), at 4. On November 16, 2004, the Commission dismissed the case because Scott intended to pursue her claim in another forum. *See* Notice of Administrative Closure, No. M–E–0S–97–1003744–E (annexed to Complaint, filed Dec. 8, 2004 (Docket # 1) ("Compl.")). Scott also filed a charge with the United States Equal Employment Opportunity Commission, and received a right to sue letter dated October 8, 2004. *See* Notice of Right to Sue, No. 160200401320 (annexed to Compl.).

#### 2. Proceedings in this Court

Scott filed this action pro se on December 8, 2004, but she was eventually represented by counsel. Following discovery, including the deposition of the plaintiff, both the DOC and the Seabrook defendants moved for summary judgment.[1] Shortly thereafter, plaintiff's original counsel was replaced by new counsel. *See Scott v. City of N.Y. Dep't of Corr.*, 2007 WL 4178405, at *2 (S.D.N.Y. Nov. 26, 2007) ("*Scott I*"). Scott's new counsel moved to amend the complaint and that motion was denied. *See id.;* Order, filed Mar. 3, 2008 (Docket # 91). Although the discovery deadline had passed, the Court permitted Scott to engage in additional discovery. *See Scott I*, 2007 WL 4178405, at *8. After Scott's additional discovery was concluded, Scott filed a memorandum of law and an affidavit opposing the summary judgment motion.[2] The defendants filed reply papers.[3]

### B. Facts

As an initial matter, we note that Scott's and the Seabrook defendants' papers suffer from significant procedural defects. First, while the Seabrook defendants and

---

1. *See* Seabrook Mem.; Affidavit of Norman Seabrook (annexed as Ex. 2 to Seabrook Mem.) ("Seabrook Aff."); Defendants' Statement Pursuant to Local Rule 56.1, filed Sept. 15, 2006 (Docket # 42); DOC Mot.; City Defendant's Rule 56.1 Statement of Undisputed Material Facts (annexed to DOC Mot.); Affidavit of Liz Castro (annexed as Ex. 3 to Seabrook Mem.) ("Castro Aff."); Blauschild Decl.; Memorandum of Law, filed Sept. 22, 2006 (Docket # 47) ("DOC Mem."). The Seabrook defendants do not seem to have filed a notice of motion.

2. *See* Plaintiff's Memorandum of Law in Opposition to the Motion of Defendants for Summary Judgment, filed Oct. 4, 2008 (Docket # 100) ("Pl. Mem."); Affidavit, filed Oct. 10, 2008 (Docket # 102) ("Scott Aff.").

3. *See* Reply Memorandum of Law in Further Support of Defendants' Norman Seabrook and Correction Officers' Benevolent Association (COBA) Motion for Summary Judgment, filed Oct. 31, 2008 (Docket # 108); City Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, filed Nov. 14, 2008 (Docket # 109).

the DOC submitted statements pursuant to Local Civil Rule 56.1, Scott failed to submit a counterstatement as required by Local Civil Rule 56.1(b). The terms of that rule dictate that all the statements in a defendant's Rule 56.1 statement are deemed admitted where, as here, they are not controverted. *See* Local Civil Rule 56.1(c); *accord Chimarev v. TD Waterhouse Investor Servs., Inc.*, 280 F.Supp.2d 208, 223 (S.D.N.Y.2003).

The Seabrook defendants, however, failed to comply with Local Civil Rule 56.1(d), which requires that each assertion in their Rule 56.1 Statement be "followed by citation to evidence which would be admissible." Also, the Seabrook defendants attached documents to their memorandum of law without any sworn statement as to their authenticity as required by Fed.R.Civ.P. 56(e).

With respect to the failings of Scott and the Seabrook defendants, the Court deems it the better course to simply examine the evidence cited by Scott in her memorandum of law to determine whether she points to any admissible evidence that would permit the suit to proceed.

▮ Having complied with the governing rules, the City is in the best position to argue that the factual statements in its Rule 56.1 statement should be deemed admitted. It is unnecessary to reach this question, however, since, even accepting as true the record evidence marshaled by Scott in her memorandum of law, she has not provided admissible evidence that would allow a jury to return a verdict in her favor against the City.

▮ Finally, we note that while Scott cites to some evidence in her memorandum

of law, it contains no fact section, and large swaths of it contain factual statements lacking any citation whatsoever. *See, e.g.,* Pl. Mem. at 8–10, 12.[4] Scott does append to the affidavit she submitted with her opposition papers, *see* Scott Aff., certain pages of her deposition that she identifies as those that are "referred to" in her brief, *see id.* ¶ 22; Scott Deposition Pages (annexed as Ex. D to Scott Aff.). The Court has considered these materials but notes that it is not otherwise "required to scour the record looking for factual disputes." *Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995). Accordingly, with one exception, the Court has not taken upon itself to determine if there is other evidence in the record, not cited by plaintiff in her brief, that might have been favorable to her. The one exception is the incident involving Seabrook itself. While Scott's memorandum does nothing to marshal the evidence regarding this incident, and her affidavit contains hardly any allegations on the topic, the incident is at the heart of this case and thus the Court has taken it upon itself to examine the portions of Scott's deposition that relate to this incident. *See* Deposition of Collette J. Scott (annexed to Seabrook Mem.) ("Scott Dep.").

### 1. *Background*

Scott was a correction officer with the DOC beginning in December 1984. *See* Scott Dep. at 12. Due to an interaction with a superior officer that occurred on January 18, 1995, a complaint was filed against Scott for being disrespectful to a superior officer. *See* Memorandum of Complaint (Feb. 8, 1995) (annexed as Ex. F. to Blauschild Decl.). As a result, she

---

4. Plaintiff's citation to her complaint, Pl. Mem. at 1–2, adds nothing to the evidence inasmuch as, despite its title, the filed complaint is unverified. While the affidavit submitted with Scott's motion summarizes some of the claims made in the complaint, it does not attest to their veracity. *See* Scott Aff. ¶¶ 4–6.

had to appear at an Office of Administrative Trials and Hearings ("OATH") preliminary hearing to dispute the charges. *See* Seabrook Aff. ¶ 5; Scott Aff. ¶ 2; Scott Dep. at 53.

### 2. *Alleged Incident in Seabrook's Office*

The OATH preliminary hearing was held on May 15, 1996. *See* Seabrook Aff. ¶ 5. On that date at about 10:00 a.m., approximately an hour before the OATH hearing, Scott went to Seabrook's office, Scott Dep. at 58, which was located within COBA's offices, *id.* at 53. Seabrook was the president of COBA, which is a union representing about 9,000 New York City correction officers. *See* Seabrook Aff. ¶¶ 2–3. Seabrook had told Scott previously on the phone that "if he became president he would help" Scott with her hearing. Scott Dep. at 53–54. Scott could not recall meeting Seabrook prior to this day, though he told her that he had worked with her "in the courts" for one day previously. *Id.* at 54.

Scott arrived at Seabrook's office in civilian clothes, but had brought a uniform in a bag to wear at the OATH hearing. *Id.* at 63. Scott testified that Seabrook invited her into his office, closed the door, and complimented her lips. *Id.* When she opened her briefcase to take out papers related to the case, he grabbed her around her waist and then "put his tongue in [her] mouth." *Id.* at 64. Scott pushed. him away and told him to stop. *Id.* He did it again, and she again told him to stop. *Id.* at 65. She backed away from him and he said "okay, okay." *Id.* He then said to her "take off your clothes and put on your uniform right now in front of me." *Id.* at 67. Although there was a private bathroom in his office, she interpreted the words to mean that she change in his

presence. *Id.* at 66–67. At that point Liz Castro, then COBA's Treasury Secretary, entered the room "just like the squad comes in when they are going for an incident that happened in a dorm area" at Rikers Island. *Id.* at 68–69; *see* Castro Aff. ¶ 2 (noting Castro's position). Scott believes Castro may have overheard Scott say "stop" to Seabrook. Scott Dep. at 68–69. At that point, Seabrook asked Castro "[d]on't you think [Scott] is pretty." *Id.* at 84. Castro replied, still in Scott's presence, "I always thought [Scott] was pretty." *Id.* at 85. Though Scott took this as a compliment from Castro, it made Scott feel additionally uncomfortable because Scott believed Castro to be a lesbian. *Id.* at 85–86. Scott then left the room and took a cab to the building where the hearing would be held. *Id.* at 89. She changed into her uniform at a bathroom in that building. *Id.*

### 3. *Complaints by Scott*

In addition to the February 24, 1997 claim relating to Seabrook's action, Scott has written memoranda to various persons at the DOC making other complaints. The memoranda cited in the complaint are: a complaint with the CHR regarding Seabrook's May 1996 sexual assault on February 14, 1997,[5] Compl. ¶ 22, a complaint against Seabrook with DOC's Equal Employment Opportunity Office on March 14, 1997, *id.* ¶ 24, a July 18, 1998 memorandum to the Commissioner of the DOC that alleges that Scott was not given a "steady post" because she was black and female, *id.* ¶ 31; DOC—Intradepartmental Memorandum from Ms. Collette Jacques–Scott, Correctional Officer # 7569, to Bernard B. Kerik, Commissioner (July 18, 1998) (an-

---

5. The complaint uses the year "1996," *see* Compl. ¶ 22, but this is plainly a typographi-

cal error, *see* NYCCHR Compl. at 1.

nexed as Ex. C. To Scott Aff.) ("July 18 Mem.").[6]

### 4. *Officer Dawkins' Conduct*

After the alleged incident in Seabrook's office, fellow Correction Officer Keith Dawkins taunted Scott "every time" when she was "getting ready to leave," saying things such as "oh, I know Norman bought you that truck." Scott Dep. at 334; *accord* Scott Aff. ¶ 15. And he "continuously kept doing this to me." Scott Dep. at 334. Dawkins was not a superior officer to Scott, but was a union delegate. *Id.* at 335. Scott notified Castro of this harassment in writing. *Id.* at 334. Castro responded to this letter, stating that she met with Dawkins to address the matter. Letter from Elizabeth Castro to Collette J. Scott (June 5, 2001) (annexed as Ex. C to Scott Aff.).

Sometimes Dawkins would tell a captain to write Scott up for misconduct—for example, for being out of uniform. Scott Dep. at 340. One time Dawkins attempted to serve the charges himself, even though this was not permitted, and the charges were dropped. *Id.* at 340–41. Scott believed the charges were proffered against her because she was "an Afro–American female." *Id.* at 366.

### 5. *Other Conduct After the Alleged Seabrook Incident*

Scott's affidavit in support of her opposition to the defendants' motion states that she "felt" that the DOC and COBA

> together made working at the DOC very near impossible. It wasn't just the things they did to me. It was that I was always stressed and worrying about what they were going to do next and knowing that when I complained

through channels or to the DOC EEO, that I would get no support from COBA.

Scott Aff. ¶ 11. She states, without elaboration, that she was "falsely" written up for being disrespectful in May 2003. *Id.* ¶ 12. She states that a COBA executive, Guy Anderson, refused to tell the administrative law judge at an OATH hearing that the charge at issue in the hearing was untimely and should have been dropped. *Id.*

Scott states that there was an incident in 2003 in which she was "written up for failing to submit a late slip." *Id.* ¶ 13. She states that the "had to appeal the decision to the Civil Service Commission," which reversed the decision against her from OATH. *Id.*

Scott states that in 2005, she was "written up" by DOC's Health Management Division in November 2005. *Id.* ¶ 14. She states that the COBA delegate refused to represent her. *Id.*

## II. *LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT*

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact "may reasonably be resolved in favor of either party" and thus should be left to the finder of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

**6.** For reasons explained in section III.C.2 below, in which we discuss the retaliation claim, we do not consider the many other memoranda to her superiors and other complaints that Scott has annexed to her affidavit. As they do not constitute admissible evidence for purposes of any other claim, they are not relevant to this motion.

When determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, the non-moving party "must come forward with 'specific facts showing that there is a *genuine issue for trial,*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.2005) (citation omitted). In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (citation, internal quotation marks, and brackets omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir.1996); *accord Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir.2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's

part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'") (citation omitted).

■ Although the Second Circuit has noted that "an extra measure of caution" is needed in granting summary judgment in discrimination cases since direct evidence of discriminatory intent is rare, a finding of summary judgment is nonetheless appropriate for discrimination claims lacking a genuine issue of material fact. *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir.2006) (citation omitted); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001); *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), *cert. denied*, 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001).

## III. *DISCUSSION*

Scott's complaint contains three claims: (1) that the Seabrook defendants discriminated against Scott on the basis of her sex because of the incident in Seabrook's office and some subsequent conduct that was sexually demeaning, Compl. ¶¶ 42–57; (2) that Scott was the victim of a hostile environment in her workplace, *id.* ¶¶ 58–67; and (3) that Scott was the subject of retaliation for protected activity, *id.* ¶¶ 68–74. The Court has previously ruled that any claims of discrimination in the workplace on the basis of sex apart from the allegations of a hostile work environment are not part of this case both because such claims are not contained in the complaint and because, in any event, any such claims are unexhausted. *See Scott I*, 2007 WL 4178405, at *5–8; Order, filed Mar. 3, 2008 (Docket # 91).

We discuss each of these three claims separately.

### A. Hostile Work Environment/Sexual Harassment Claim Against Seabrook Defendants

Scott's first claim of discrimination consists of the claim against the Seabrook defendants alleging that they created a hostile work environment based on her sex.[7] The evidence cited in Scott's memorandum of law as to this claim is the incident involving Seabrook, Pl. Mem. at 6 (citing Scott Dep. at 63–65, 68–71); improper comments made by Dawkins, *id.* (citing Scott Dep. at 334–45); and Scott's assertion that the union instigated certain charges against her and did not properly represent her with respect to some charges, *id.* at 7 (citing Scott Dep. at 180, 192–93, 340–41, 366, 422).

#### 1. Law Governing Hostile Work Environment Claims Generally

■ Scott relies on Title VII, *see* 42 U.S.C. § 2000e–2(a)(1); the New York State Human Rights Law, N.Y. Exec. Law § 296; and the New York City Administrative Code, N.Y. City Admin. Code § 8–107 to support her claims for relief, *see* Compl. ¶¶ 1–2, 54–57. The city and state law claims are normally evaluated based on the same analysis that is used for Title VII claims. *See Cruz v. Coach Stores,*

*Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000); *McDowell v. T–Mobile USA, Inc.,* 2007 WL 2816194, at *7 n. 16 (E.D.N.Y. Sept. 26, 2007).

■ One manner in which discrimination on the basis of sex may occur in the employment context is through a hostile work environment. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To prevail on a hostile work environment claim, a plaintiff must establish both that the work environment was hostile and that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Howley v. Town of Stratford,* 217 F.3d 141, 153–54 (2d Cir. 2000); *accord Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004); *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998); *Gallo v. Alitalia–Linee Aeree Italiane–Societa per Azioni,* 585 F.Supp.2d 520, 536 (S.D.N.Y.2008).[8]

■ To show a hostile work environment, "a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz,* 202 F.3d at 570 (internal citations and quotation marks omitted). In determining whether such an environ-

---

7. To the extent Scott's motion papers may be read to suggest that she seeks to pursue a claim of sex discrimination against the union other than a hostile environment claim, it is not clear that such a claim is contained in the complaint and, in any event, she has not submitted evidence that would support such a claim. Thus, we do not consider such a claim further.

8. However, "[i]n contrast to allegations of harassment by co-workers or customers, employers are presumptively liable for all acts of harassment perpetrated by an employee's su-

pervisor." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 (2d Cir.1998); *accord Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Under federal law, this presumption can overcome by showing that the employer took "reasonable care" to prevent and correct harassment, and the plaintiff unreasonably failed to use available "preventative or corrective" opportunities. *See Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. 2257; *Gallo,* 585 F.Supp.2d at 536.

ment exists, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). Isolated harassing events do not reach this level unless they involve an extraordinarily severe single event, or a series of incidents that were "sufficiently continuous and concerted" to alter the conditions of a plaintiff's working environment. *Id.* at 786–88 & n. 1, 118 S.Ct. 2275 (citation omitted); *see also Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir.2008) ("extraordinarily severe" single event can constitute harassment); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995) ("even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability"); *cf. Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir.2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."). To be actionable, the conduct at issue need not contain any sexual component or any reference to the victim's sex; on the other hand, it must be "reasonably be interpreted as having been taken on the basis of plaintiff's sex." *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir.2001); *see, e.g., Howley*, 217 F.3d at 145, 148, 154–55 (conduct that was not overtly sex-based constituted part of hostile work environment where plaintiff was the only woman among 100 firefighters and other harassing conduct was explicitly sexual in nature).

### 2. *Union Liability Under Title VII*

The above-cited cases—along with the vast bulk of case law regarding sexual harassment and hostile environment claims—involve incidents at the workplace arising under the portion of Title VII that bars discrimination by an employer in the "terms [and] conditions" of employment. 42 U.S.C. § 2000e–2(a)(1). Thus, hostile environment case law speaks of incidents that are so severe as to alter the "conditions" of the victim's employment, *Cruz*, 202 F.3d at 570, or conduct that unreasonably interferes with the victim's "work" performance, *Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367)

The claims against the Seabrook defendants, however, are not based on the portion of Title VII applicable to employers. Rather these claims necessarily arise under a separate provision of Title VII regulating labor unions. This provision states that a labor union may not take actions "to exclude or to expel from its membership, *or otherwise discriminate against*, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(c)(1) (emphasis added); *accord* N.Y. Exec. Law § 296(1)(c) (unlawful for a union "to discriminate in any way against any of its members" because of sex); N.Y. City Admin. Code § 8–107(c) (same). Scott has not been excluded or expelled from the union and thus the question becomes whether the union "otherwise discriminate[d]" against her.

While section 2000e–2(c)(1) contains no reference to "terms [and] conditions" of employment, it bars any kind of "discrimination" by a union, and thus as a logical matter bars discrimination in the terms and conditions of union membership. Accordingly, in evaluating Scott's claim, we ask whether the conduct alleged in Scott's case was so severe as to "alter" the terms and conditions of Scott's union member-

ship, *e.g.*, *Cruz*, 202 F.3d at 570, to borrow the formulation used in the employment context. Courts have commonly permitted claims against a union to go forward where the union has discriminated against the member in the treatment of grievances. *See, e.g.*, *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 666, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (section 2000e–2(c)(1) violated where union refused to process grievances based on race); *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 882 (9th Cir.2007) (union violates Title VII when "it deliberately declines to pursue a member's claim because of the member's gender"); *Maegdlin v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 949*, 309 F.3d 1051, 1053 (8th Cir.2002) ("plaintiff may bring an action under Title VII . . . if his union, for discriminatory reasons, breaches its duty to represent him fairly in the handling of his complaints and grievances").

■ While such cases against union typically involve a discriminatory failure to afford a benefit to a union member, case law equally makes clear that a union is liable under Title VII for situations in which the union is responsible for creating a hostile environment for a union member because of the member's race or sex. For example, in *Dixon v. International Brotherhood of Police Officers*, 504 F.3d 73 (1st Cir.2007), a union member sued her union for sex discrimination because of sexually harassing incidents that occurred on a bus that had been hired by the union for a trip to a political rally for union members. The Court allowed the suit to proceed against the union on the ground that it was "a case of discrimination within the union,

by union members (including members of the Local's executive board), under the supervision and acquiescence of the Local's president." *Id.* at 85; *see also Dowd v. United Steelworkers of Am., Local No. 286*, 253 F.3d 1093, 1103 (8th Cir.2001) (allowing Title VII hostile environment claim against union where "there was evidence that at least one union steward participated in the harassment, that others stood silently by as it occurred, and that the union's president exhibited discriminatory animus"); *Herrera v. Int'l Bhd. of Elec. Workers Union, Local 68*, 228 F.Supp.2d 1233, 1243–44 (D.Colo.2002) (sexual harassment claim involving conduct and comments during apprenticeship course given by union).[9]

### 3. *Analysis*

■ Scott contends that Seabrook's act in forcing his tongue into her mouth and the various acts by the union subsequent to this event—consisting of officer Dawkins' comments, the union's alleged instigation of false charges against Scott, and its failure to defend her properly *see* Pl. Mem. at 6–7; Scott Aff. ¶¶ 11–15—constituted sexual harassment.

The Seabrook defendants argue that the conduct alleged is insufficient to constitute sexual harassment on the ground that "Seabrook stands accused of a single occurrence of trying to kiss Plaintiff." Seabrook Mem. at 10. Resolving all factual disputes in Scott's favor, however, the incident is more serious than the Seabrook defendants allow. Seabrook was the president of the union and was alone with Scott in his office. Scott Dep. at 53, 63. Scott was less than an hour away from facing disciplinary charges at which she

9. The union has not argued that it would not be not legally responsible for the conduct of Seabrook and the other union actors if the conduct were found to violate Title VII or the

other discrimination statutes. Accordingly, it is unnecessary to discuss the issue of vicarious liability with respect to the union.

was to be represented by a lawyer retained by the union. *Id.* at 53–54, 58, 63–65, 91. She was meeting with Seabrook for the purpose of gaining assistance and advice while in this difficult situation. *Id.* at 62. The two had no prior interactions with each other beyond a phone call to discuss the same disciplinary matter, *id.* at 53–54, and thus had no relationship, working or otherwise, that would lead a reasonable person in Scott's position to believe any kind of non-business interaction was in the offing. The advances—culminating in Seabrook's putting his tongue in Scott's mouth twice, *id.* at 64–65—were highly obtrusive and offensive. In addition, Seabrook allegedly told Scott to undress after Scott had rejected his advances. *Id.* at 66–67. Considering the incident as a whole, a reasonable jury could conclude that this was an "extraordinarily severe" single event, *Mathirampuzha,* 548 F.3d at 79, that materially altered the conditions of Scott's union membership. Thus, we need not consider separately the question of whether the additional conduct by the union—that notably included a union delegate, Officer Dawkins, mocking and insulting Scott with respect to her purported relationship with Seabrook, Scott Dep. at 334–36—is needed to make out the hostile environment claim.

Our conclusion is bolstered by decisions arising in the employment context finding a viable hostile environment claim in similarly serious circumstances. *See, e.g., Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 809 (7th Cir.2000) (co-worker held victim's face in his hands, forced his tongue in her mouth, and began to unfasten her bra); *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1072 (10th Cir.1998) ("single incident" in which a customer pulled waitress by the hair, grabbed her breast, and placed his mouth on it); *Moring v. Ark. Dep't of Corr.,* 243 F.3d 452, 454–55 (8th Cir.2001) (verbal sexual advances with

touching of thigh and attempt to kiss in a motel room on an out-of-town trip); *Rozell v. Ross–Holst,* 2007 U.S. Dist. LEXIS 46450, at *1–2 (S.D.N.Y. June 21, 2007) (supervisor attempted to kiss a plaintiff at a Christmas party and subsequently hacked into plaintiff's private email account); *Fall v. Ind. Univ. Bd. of Trustees,* 12 F.Supp.2d 870, 873 (N.D.Ind.1998) (supervisor called employee into his office on pretext, closing door, and forcibly kissed her while groping her breasts); *Prindle v. TNT Logistics of N. Am.,* 331 F.Supp.2d 739, 750–751 (W.D.Wis.2004) (one breast touching incident); *Ferguson v. Chicago Hous. Auth.,* 155 F.Supp.2d 913, 916–17 (N.D.Ill.2001) (repeated but limited acts of verbal sexual advances and unwanted touching); *Barrett v. Omaha Nat'l Bank,* 584 F.Supp. 22, 24, 30 (D.Neb.1983) (incident of physical touching inside the confined space of an automobile) (liability denied on other grounds), *aff'd,* 726 F.2d 424 (8th Cir.1984); *Redman v. Lima City Sch. Dist. Bd. of Educ.,* 889 F.Supp. 288, 291, 293 (N.D.Ohio 1995) (plaintiff forced against wall and supervisor proceeded to fondle and rub against the plaintiff in a sexual manner). Cases involving physical contact that were not found to be sufficient to constitute sexual harassment were less severe than what has been alleged here. *See, e.g., Quinn,* 159 F.3d at 768 (two alleged incidents of hostile treatment, in which a supervisor made a comment about the plaintiff's body and touched her breasts with some papers); *Koelsch v. Beltone Elecs. Corp.,* 46 F.3d 705, 706–08 (7th Cir.1995) (company president rubbed the plaintiff's leg, grabbed her buttocks, and asked her for dates); *Saxton v. Am. Tel. & Tel. Co.,* 10 F.3d 526, 528, 534–35 (7th Cir.1993) (supervisor put his hand on the plaintiff's leg and kissed her until she pushed him away, and on another occasion the supervisor lurched at the plaintiff and

tried to grab her); *Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993) (supervisor asked the plaintiff for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her).

The cases relied upon by the Seabrook defendants, *see* Seabrook Mem. at 9–11, do not require a different outcome. *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294 (S.D.N.Y.1987), the primary case relied on by the Seabrook defendants, was a decision following a bench trial. While the court's decision rejecting the sexual harassment claim recounted the plaintiff's testimony in detail, the court made clear that it had discredited much of her testimony, *id.* at 299, and, in the end, found only that there was "some sexual tension between" the plaintiff and the supervisor, *id.* at 300. In *Saxton,* 10 F.3d at 528, 534–35, there was an attempted kiss after the supervisor and the plaintiff had spent several hours drinking together, and had socialized together on previous occasions. This is far different from two forced kisses during an initial meeting in an office shortly before the plaintiff needs to appear at an important hearing. *O'Dell v. Trans World Entertainment Corp.,* 153 F.Supp.2d 378 (S.D.N.Y.2001), and *Lamar v. Nynex Service Co.,* 891 F.Supp. 184 (S.D.N.Y.1995), also cited by the defendants, both involved far less dramatic circumstances, including touching a plaintiff's hand and making vulgar comments, *Lamar,* 891 F.Supp. at 185, and unwanted email communication and repeated requests for dates, *O'Dell,* 153 F.Supp.2d at 386.

"While a trier of fact may conclude that plaintiff's environment was indeed not so objectionable as to alter the terms and conditions of her" union membership, "the record does not compel that as the only result." *Rooney v. Capital Dist. Transp. Auth.,* 109 F.Supp.2d 86, 94–95 (N.D.N.Y. 2000) ("reasonable person could find [plaintiff's] working conditions altered for the worse if she was kissed and fondled by a co-worker with whom she shared a workstation and then after reporting the incident, forced to continue working in close proximity with the harasser, thereby enduring further taunting and physical intimidation"). Accordingly, summary judgment on this question should be denied on the ground that a reasonable jury could find that the union altered the terms and conditions of Scott's membership in her union on account of her sex.

**B. *Hostile Environment Claim Against DOC***

■ Scott's complaint also contains a claim against the DOC for "hostile environment" in her workplace. Compl. ¶¶ 58–67. Her memorandum of law spends little time on this claim, however, and its title reflects that she is contending that "The DOC is Liable for the Actions of COBA and Norman Seabrook." *See* Pl. Mem. at 13. Scott argues that the DOC is liable for Seabrook's conduct "under the doctrine of respondeat superior." *See id.* She argues that "[a] union employee [apparently referring to Seabrook] who is still paid by the company, in this case DOC, may still be considered an employee of the company." *Id.* Putting aside the question of whether the record reflects who pays Seabrook, the fact is that there is no evidence that Seabrook was either a co-worker or a supervisor, and Scott's brief articulates no basis of liability for the DOC for his actions. *See, e.g., Petrosino,* 385 F.3d at 225 (respondeat liability available based on actions of "supervisors" and "co-workers").

■ Scott refers to a portion of her deposition in which she asserts that Dawkins, the union delegate, "would" tell a

captain to write Scott up on disciplinary charges and the captain "would" write Scott up. *See* Pl. Mem. at 13 (citing Scott Dep. at 340–41). This single piece of evidence—lacking in descriptions of incidents, names or dates—is far too conclusory to meet plaintiff's burden on summary judgment, however. It is thus insufficient to attribute any actionable sexual harassment by the union to DOC.

█ Nor does Dawkins' alleged taunting establish liability on the part of the City. *See* Pl. Mem. at 13 (citing Scott Dep. at 340–41). Scott acknowledged that Dawkins was not a superior officer to Scott within the DOC. Scott Dep. at 335. Further, according to Scott, the only point in which she complained to the DOC of Dawkins' behavior concerned matters unrelated to his sexual harassment or Seabrook. *Id.* at 335–36, 338. Thus, by Scott's own admission, the DOC was never put on notice of Dawkins' alleged sexual harassment, and so the DOC cannot be held liable for such actions. *See Petrosino*, 385 F.3d at 225. In any event, Dawkins' alleged harassing comments, although boorish and highly insensitive, standing alone, do not constitute sexual harassment that is pervasive or severe enough to render the DOC liable.

█ Thus, the harassment claim against the DOC should be dismissed.[10]

### C. *Retaliation Claims*

#### 1. *Law on Retaliation*

█ To make out a prima facie case of retaliation under Title VII, a plaintiff must produce evidence sufficient to permit a rational trier of fact to find "[1] that she engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir.2001) (internal quotation marks and citations omitted) (brackets in original); *accord Patane v. Clark*, 508 F.3d 106, 115 (2d Cir.2007). To show the protected activity element, the plaintiff need only have had a "good faith, reasonable belief that [she] was opposing an employment practice made unlawful by" statute. *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir.2006) (citation omitted). To show adverse action, the plaintiff must prove "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *accord Kessler*, 461 F.3d at 207. To prove causation, the plaintiff must show that the protected activity was "a substantial motivating factor" for the adverse action. *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir.2004). "Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plain-

---

**10.** Scott also briefly refers to the union's duty of fair representation. *See* Pl. Mem. at 13 (citing *Nweke v. Prudential Ins. Co. of Am.*, 25 F.Supp.2d 203 (S.D.N.Y.1998)). Putting aside the fact that no such claim appeared in Scott's complaint, such a duty is owed by a union, *see Nweke*, 25 F.Supp.2d at 220–22, and is not a basis for holding an employer liable.

tiff by the defendant." *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.) (internal citations and emphasis omitted), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); *accord Martinez v. N.Y. City Dep't of Educ.*, 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008); *Carr v. WestLB Admin., Inc.*, 171 F.Supp.2d 302, 309 (S.D.N.Y.2001).

## 2. *Facts Relating to Retaliation*

 It has not been a simple matter to determine what claims are in this case. The claims properly before this Court do not consist of the universe of diffuse claims, largely lacking in citation, that plaintiff raises in her memorandum of law. *See* Pl. Mem. at 8–10. We turn first to the complaint to limit the scope of the claims because the complaint has not been amended in this matter and the previous motion to amend the complaint—which did not even seek to enlarge the retaliation claims made in the complaint—was denied. *See Scott I*, 2007 WL 4178405, at *8. It is critical to focus on what specific claims are made in the complaint because the arguments in Scott's memorandum of law are premised on the assumption that she is free to assert that all the numerous memoranda she submitted to the DOC over the years complaining about incidents at work, extending into 2006, *see* Scott Complaints (annexed as Ex. C to Scott Aff.), constitute relevant protected activity and that any instances of perceived adverse treatment at work since 1998 comprise potential instances of retaliation. But case law holds that "it is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment." *Alali v. DeBara*, 2008 WL 4700431, at *3 n. 6 (S.D.N.Y. Oct. 24, 2008); *Kearney v. County of Rockland*, 373 F.Supp.2d 434, 440–41 (S.D.N.Y.2005) (declining to consider hostile work environment claim raised for the first time in opposition to summary judgment) (collect-

ing cases); *accord Flynn v. N.Y. State Div. of Parole*, 620 F.Supp.2d 463, 489 n. 32 (S.D.N.Y.2009) ("[Plaintiff] raises this claim for the first time in her opposition papers to the instant motion. Therefore, we will not consider this claim as a basis for liability here."); *Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in Plaintiff's opposition papers, and hence such new allegations and claims should not be considered.").

The complaint in this case contains claims far narrower than the claims Scott has argued in opposition to the summary judgment motion. With respect to what specific protected activity is at issue, the complaint alleges that Scott filed a complaint with the CHR regarding Seabrook's May 1996 sexual assault on February 14, 1997, and a complaint against Seabrook with DOC's Equal Employment Opportunity Office on March 14, 1997. Compl. ¶¶ 22, 24. Scott also refers to a complaint to the Commissioner that she made regarding a "posted steady tour." *Id.* ¶ 31. This apparently refers to a July 18, 1998 memorandum to the Commissioner of DOC that alleges that Scott was not given a "steady post" because she was black and female. *See* July 18 Mem. These three complaints are in the record and therefore they are properly considered. We will therefore examine any evidence that any alleged retaliatory acts against Scott occurred because she made these complaints.

As for what alleged adverse actions constitute acts of retaliation that are part of this case, the complaint alleges at most five kinds of retaliation:

(1) Seabrook used his office to cause charges to be lodged against Scott as "command discipline"—rather than in a

form that would be heard at a hearing—in order to "stop Plaintiff from filing a sex charge against" Seabrook, Compl. ¶ 26;

(2) Scott was harassed by Dawkins "after" she filed her complaint against Seabrook, *id.* ¶ 33; [11]

(3) Scott was not issued a bulletproof vest or "a citywide radio" after she was robbed at gunpoint, *id.* ¶ 69;

(4) members of the COBA Executive Board appeared at Scott's post asking that she withdraw her complaint against Seabrook, *id.* ¶ 70; and

(5) Scott was served with "expired" departmental charges and COBA Executive Board member Guy Anderson refused to testify "to the fact that due process has expired at the command level," *id.* ¶ 71.

We now examine each of these five alleged incidents to determine whether Scott's memorandum of law has marshaled any evidence that would allow a reasonable jury verdict to find that they occurred and that they constituted retaliation.

### 3. *Discussion*

▬ a. *Command Discipline Allegation.* With respect to the claim that Seabrook caused charges to be lodged as "command discipline" rather than in a form that would be held at a hearing, Scott's memorandum of law cites to no admissible evidence that this occurred and it is not even discussed in Scott's affidavit—at least not in any comprehensible form. In any event, she provides no evidence as to why the use of command discipline rather than a hearing process would have dissuaded a reasonable worker from making or supporting a discrimination charge.

Before leaving this point, we note that we are aware that there are some scattered mentions of disciplinary action contained in the complaint. *See, e.g.,* Compl. ¶ 30 (Scott denied a "steady post"); ¶ 34 (Scott charged with feigning illness when she missed time from work due to "job related stress"). But the complaint does not state that these occurred in retaliation for any protected activity. Moreover, plaintiff's memorandum cites to no evidence to support the happening of any of these events, Pl. Mem. at 8–9, and plaintiff's affidavit on these point merely summarizes the complaint, Scott Aff. ¶ 5—again without supplying admissible evidence.

▬ While it is not necessary to reach the issue of causation in order to dispose of the command discipline claim, we note that plaintiff has not provided any argument that the imposition of such discipline was caused by her protected activity. In her memorandum of law, Scott does not contend that there is any specific evidence of causation linking her complaints and the alleged acts of retaliation—other than to assert that there was a temporal proximity between her complaints and the adverse actions, and to infer causation from the "pattern of antagonism." *See* Pl. Mem. at 9–11. It bears noting that the evidence in the record shows that Scott was the subject of multiple disciplinary actions long before her complaints of discrimination. Scott herself has conceded that between December 1984 and May 15, 1996, she filed various complaints regarding the behavior of her supervisors, including incidents regarding denials of job transfer requests and involuntary lateral moves. *See* Scott Dep. at 232, 257–61, 372–74. Additionally, during that time she had multiple com-

---

**11.** While the complaint uses the term "after" rather than "because," it may be fairly construed as alleging that Dawkins conduct was in retaliation for her complaint against Seabrook.

plaints filed against her by various deputy wardens, including for feigning an illness. *See id.* at 94–98, 372. Scott said she did not know how many such charges were filed but stated that they were "always false charges." *Id.* at 95. Later in her deposition, she stated that she filed complaints about these charges "all the time." *Id.* at 260. As the Second Circuit has noted, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.2001). Scott's inclusion of a claim that there was a "pattern of antagonism" does not change this logic: whatever "antagonism" Scott perceived after her protected activity complaint was present beforehand as well.

██ b. *Harassment by Dawkins.* Scott has submitted evidence as to the harassment by Dawkins and thus it forms part of the retaliation claim. It consists of her affidavit stating "I had COBA delegates Dawkins and Simmons with whom I worked who were harassing me on a daily basis to drop the case against Seabrook." Scott Aff. ¶ 15. Additionally, in her deposition, she testified that Dawkins would call her names after work, including calling her "Norman's girl" and suggesting that Seabrook bought her gifts such as her car. Scott Dep. at 334–35. Further, she alleges that Dawkins would work with a captain to "write her up" on frivolous charges. *Id.* at 341, 365–66. While the comments Dawkins allegedly made are stated with specificity, the remaining allegations are conclusory. Together, this is insufficient evidence to allow a reasonable jury to find retaliation for several reasons.

██ First, verbal abuse is typically insufficient to constitute an "adverse employment action" because "[n]egative or otherwise insulting statements are hardly even actions, let alone 'adverse actions.' " *Blake v. Potter*, 2007 WL 2815637, at *8 (S.D.N.Y. Sept. 25, 2007) (quoting *Bickerstaff v. Vassar Coll.*, 354 F.Supp.2d 276, 280 (S.D.N.Y.2004); *see also Teachout v. N.Y. City Dep't. of Educ.*, 2006 WL 452022, at *13 (S.D.N.Y. Feb. 22, 2006)) ("Negative comments . . . are not, standing alone, adverse employment actions, because mere comments do not materially affect employment."); *Mallett v. Town of Plainville*, 2006 WL 931712, at *8 (D.Conn. Apr. 4, 2006) ("the fact that [co-employee] used offensive and inappropriate language and called [plaintiff] names on a few occasions does not constitute adverse action," nor is "criticism alone" sufficient to show adverse action); *Smalls v. Allstate Ins. Co.*, 396 F.Supp.2d 364, 371 (S.D.N.Y.2005) ("Being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions."); *Brennan v. City of White Plains*, 67 F.Supp.2d 362, 374 (S.D.N.Y.1999) (yelling once and telling plaintiff another time that she had "made it miserable here" not an adverse employment action); *Pomilio v. Wachtell Lipton Rosen & Katz*, 1999 WL 9843, at *8 (S.D.N.Y. Jan. 11, 1999) ("plaintiff's allegations with respect to any sarcastic comments, demeaning comments, insults, threats, and intimidation do not constitute an adverse employment action"); *Rivera v. Prudential Ins. Co.*, 1996 WL 637555, at *14 n. 5 (N.D.N.Y. Oct. 21, 1996) (defendant's verbal abuse not an adverse employment action).

██ Second, it was not Dawkins himself who "wrote" Scott up—as Dawkins was not Scott's superior—but rather a captain. *See* Scott Dep. at 335. The complaint contains only allegations regarding

Dawkins, however.[12] Moreover, to the extent that Dawkins "assisted" a captain in "writ[ing] her up" frivolously, this evidence alone is insufficient to show adverse action, as writing a reprimand for violating company policy does not itself constitute an adverse employment action. *See Cody v. County of Nassau*, 577 F.Supp.2d 623, 645 (E.D.N.Y.2008) (defendant's "falsely accusing plaintiff of being absent without authorization," "threatening plaintiff with future counseling notices and disciplinary actions," "writing plaintiff up for leaving work early," and similar actions were not adverse employment actions); *Nix v. Cino*, 2006 WL 2711625, at *5 (E.D.N.Y. Sept. 21, 2006) ("Mere reprimands or threats of disciplinary action, absent any other negative results, such as a decrease in pay, do not qualify as adverse employment actions."); *cf. White*, 548 U.S. at 68, 126 S.Ct. 2405 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience ... 'personality conflicts at work that generate antipathy' and 'snubbing by supervisors and co-workers are not actionable under § 704(a).' ") (citations omitted). Here, the evidence regarding the merits, context and timing of the disciplinary actions is completely absent and the mere fact that there was discipline instigated by Dawkins cannot allow a finding of retaliation.

■ c. *Vest/Radio Incident.* With respect to the vest/radio incident, no evidence has been provided by Scott on this point. In any event, on its face, it could not constitute an act of retaliation for com-

plaints made in 1997 and 1998 because, as the complaint itself alleges, the incident occurred in January 1995. *See* Compl. ¶ 13.

■ d. *Appearance of COBA Member.* As to allegations of a COBA Executive Board member appearing at Scott's post, the only evidence on this point that Scott submitted in her opposition papers is contained in her affidavit. There, Scott alleges that "Bobby Seabrook, a member of the COBA Executive Board who also came [to] my post to tell me to drop the suit." Scott Aff. ¶ 15. This, alone, cannot constitute retaliation, as a reasonable jury could not find that such a visit "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68, 126 S.Ct. 2405 (citation omitted).

■ e. *Incident Involving Guy Anderson.* Scott has provided only the most minimal evidence regarding her assertion that COBA Executive Board member Guy Anderson refused to testify on her behalf at a OATH hearing. Scott's brief notes the refusal of Guy Anderson to inform an administrative law judge regarding an untimeliness issue at which charges against Scott for being "disrespectful" were considered. *See* Pl. Mem. at 9; Scott Aff. ¶ 12. In Scott's affidavit in support of her opposition papers, she states that

I was falsely written up for being disrespectful in May 2003, my defense was that the charge had not been heard within the requisite 30 days. At the OATH hearing, Guy Anderson, from the COBA executive committee, refused to tell the administrative law judge that the hearing on the charge had been untime-

---

12. In fact, in portions of Scott's deposition not cited in her memorandum of law, she suggests this captain's motivation was entirely unrelated to her participation in protected activity. She testified that he continually wrote her up for frivolous reasons because her receiving a lenient sentence for a prior charge he had filed against her "didn't settle good with him." *Id.* at 336.

ly and that the charges should have been dropped.

Scott Aff. ¶ 12. There is no further description of the incident, however.[13] It is unclear what the merits were of the untimeliness point and what Anderson's particular role in the proceeding was. Given the vagueness of the allegations, a reasonable jury could not find on this evidence that Anderson's actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination, let alone that the motivation for this action was retaliation.

In sum, Scott has not provided evidence that would allow that any of the incidents alleged in the complaint constituted actionable acts of retaliation.

*Conclusion*

For the foregoing reasons, the DOC's motion for summary judgment (Docket # 46) should be granted, and the Seabrook defendants' motion for summary judgment should be granted in part and denied in part. Trial should proceed on the claim that Scott was sexually harassed by the Seabrook defendants.

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Sidney H. Stein, and to the undersigned, at 500

Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Stein. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

---

**13.** At her deposition (not cited in Scott's memorandum of law), Scott stated that Anderson was in the audience at the hearing and was aware that the charges against Scott were untimely, but that he told her "I can't say anything." Scott Dep. at 205–06. She believed the reason he would not speak was because of her complaint against Seabrook. *Id.* at 206.